UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>JASON WELLSANDT,<br><br>　　　　　　Defendant. | 5:15-CR-50008-JLV<br><br>REPORT AND RECOMMENDATION |

## **INTRODUCTION**

　　Pending is Defendant's Motion to Suppress Evidence (Doc. 12). A hearing was held on March 16, 2015. Defendant was personally present and represented by his attorney of record, Monica D. Colbath. The Government was represented by Kathryn Rich. Six witnesses testified at the hearing. Twenty-eight exhibits were received into evidence. Both parties have submitted briefs. Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the Court respectfully makes the following findings of fact and conclusions of law.

## **JURISDICTION**

　　Defendant is charged in an Indictment with Possession of Firearm by a Prohibited Person in violation of 18 U.S.C. § 992(g)(1). The pending Motion was referred to this magistrate judge for the holding of an evidentiary hearing and the issuance of a recommended disposition pursuant to 28 U.S.C. § 36(b)(1)(B)

and the March 9, 2015, standing order of the Honorable Jeffrey L. Viken, Chief Judge.

## FACTS

In the late evening hours of December 5, 2014, Deputy Sheriff Patrick Humphrey and Deputy Sherriff Rich Nasser went to the residence of Jason Wellsandt to serve a bench warrant on Jennifer Huggins. Mr. Wellsandt and Ms. Huggins were in a romantic relationship and Ms. Huggins was known to be residing with Mr. Wellsandt at 5247 Red Cliff Court in Black Hawk, South Dakota. Deputy Humphrey and Deputy Nasser arrived in separate patrol vehicles at approximately 11:00 p.m. They parked near the neighboring trailer house, walked toward Mr. Wellsandt's trailer house traveling past the railroad ties depicted in Exhibit 10. The deputies approached the trailer house and knocked on the door. A female answered the door, identified herself as "Crystal," and told the deputies that she didn't know the whereabouts of Ms. Huggins. Crystal said she would text Ms. Huggins to find her whereabouts.

The deputies began leaving the premises traveling back by the railroad ties enroute to their patrol cars and came across a black nylon bag. The deputies described the nylon bag as looking like something that one would put sunglasses in. The nylon bag was located approximately one foot from the corner of where the two railroad ties meet. As depicted in the photographs, the nylon bag was located where foot travel and vehicular travel would frequently pass. Both deputies estimated the nylon bag was approximately 20 feet from the trailer. Defense counsel's paralegal testified that the approximate location

of the nylon bag was 10 feet from the trailer, based on measurements she took after receiving the discovery in this case.  Deputy Nasser testified that he believed that the nylon bag was associated with the Wellsandt house.

      The deputies opened the bag and inside was a small plastic baggie with a substance believed to be methamphetamine, marijuana, a hypodermic needle, and a syringe.  While the officers were looking at the bag, Crystal exited the house and asked the officers what they were doing.  Although, the officers were aware that Crystal did not want the officer on the property, she did not specifically ask them to leave.  Crystal returned to the house.  At that time, a vehicle driven by Albert Nagel arrived at the Wellsandt residence.  Mr. Nagel said he was there to see his friend Jason.  Mr. Nagel then entered the trailer.

      Given law enforcement's suspicion that Crystal was untruthful regarding the whereabouts of Ms. Huggins or Mr. Wellsandt, they re-approached the residence and asked to speak with Mr. Nagel.  Mr. Nagel exited the home and consented to a search of his person which produced a glass pipe with what appeared to be methamphetamine residue on the inside of the pipe.  Mr. Nagel was placed under arrest.

      Deputy Nasser prepared an affidavit for a search warrant.  A search warrant was issued by state circuit court Judge Michelle Percy for the residence of Mr. Wellsandt.  The next day, Deputy Humphries executed the warrant on the Wellsandt home.  Ms. Huggins and three children were present at the home at the time the search warrant was executed.  During the search of

the Wellsandt home, law enforcement located methamphetamine, drug paraphernalia, cash, and a stolen firearm.

While officers were executing the search warrant, Mr. Wellsandt arrived on the scene driving a turquoise 1969 Ford F250 pickup truck. The vehicle license plate was run and was identified as belonging to Mr. Wellsandt. Deputy Nasser testified that Mr. Wellsandt appeared like he had been out all night, possibly was under the influence of something, his eyes were bloodshot and watery and he was very sweaty. HT p. 45. Mr. Wellsandt was placed under arrest based on the items found in his house and his vehicle was towed to the Meade County secured evidence lot. A second search warrant was obtained for the search of Mr. Wellsandt's turquoise 1969 Ford F250 pickup truck. The search produced a weapon which is the subject of the pending Indictment.

## DISCUSSION

Mr. Wellsandt argues that the black nylon bag was located within the curtilage of his home and is protected by the Fourth Amendment. Mr. Wellsandt argues that the search and seizure of the black nylon bag was illegal and therefore cannot form the basis of providing probable cause for the initial search warrant for the house. Mr. Wellsandt argues that without searching the house and interviewing Ms. Huggins, law enforcement would not have sufficient probable cause to obtain a second search warrant for Mr. Wellsandt's 1969 pickup truck.

The United States argues that the black nylon bag was not within the curtilage of the home and that Mr. Wellsandt did not have a reasonable

expectation of privacy in the area where the black nylon bag was found.  In the alternative, the United States argues that the search warrant was sufficient, even without the contents of the black nylon bag.  Additionally, the United States asserts that the Leon good faith exception would render the search warrant valid.

The Fourth Amendment protects a person's home and the area immediately around it to which "the intimate activity associated with the sanctity of a man's home and privacies of life" extend.  Oliver v. United States, 466 U.S. 170, 180 (1984).  This protection, however, does not extend past the curtilage.  "The Fourth Amendment protects the curtilage of an individual's residence, but not surrounding open fields."  United States v. Mathias, 721 U.S. 952, 955 (8th Cir. 2013) (quoting United States v. Boyster, 436 F.3d 986, 991 (8th Cir. 2006)). "Curtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life, and is typically comprised of land adjoining a house, often within some type of enclosure such as a fence."  Id.  "For the purposes of the Fourth Amendment, an open field may be any 'unoccupied or undeveloped area outside of the curtilage' and 'need be neither 'open' nor a 'field' as those terms are used in common speech.'"  Mathias, 721 F.3d at 955-56 (quoting United States v. Dunn, 480 U.S. 294, 304 (1987); Oliver v. United States, 466 U.S. 170, 180 n.11 (1984)).  "Under the open-fields doctrine, 'an individual may not legitimately demand privacy for activities conducted out of doors in fields' because 'an individual has no legitimate expectation that open fields will

remain free from warrantless intrusion by government officers.'" <u>United States v. Douglas</u>, 744 F.3d 1065, 1069 (8th Cir. 2014) (quoting <u>Oliver</u>, 466 U.S. at 178)). In cases where the reasonable-expectation-of-privacy test applies, the burden is on the defendant to demonstrate that he had a subjective expectation of privacy and that his expectation is one that society recognizes as objectively reasonable. <u>United States v. James</u>, 534 F.3d 868, 872-73 (8th Cir. 2008). Accordingly, to demonstrate a violation of his Fourth Amendment rights, Mr. Wellsandt must demonstrate that area where the officers found the black nylon bag was part of the curtilage of his home and as such, he had an objective reasonable expectation of privacy.

The Eighth Circuit address whether a defendant has a legitimate expectation in a tote bag left in an open field in <u>United States v. Stallings</u>, 28 F.3d 58 (8th Cir. 2994). In <u>Stallings</u>, law enforcement conducted surveillance of a field adjacent to Stallings' house and yard. 28 F.3d at 59. The field was neither leased nor owned by Stallings. <u>Id</u>. Officers observed Stallings enter the field on the path behind his house and disappear into the underbrush in the field. After Stallings returned to his house, law enforcement went into the field and observed a green tote bag in the underbrush. The tote bag appeared out of place, so law enforcement opened the bag and discovered drug paraphernalia and crack cocaine. <u>Id</u>. The court analyzed the issue under the two-part legitimate expectation of privacy test, to-wit 1) whether the petitioner has asserted a subjective expectation of privacy, and 2) whether the petitioner's subjective expectation is objectively reasonable. <u>Id</u>. at 60 (quoting <u>United State</u>

v. Kiser, 948 F.2d 418, 423 (8th Cir. 1991)).  The Eighth Circuit found that Stalling failed to meet the first prong of the test because he left the tote bag in an open field without any indicia or ownership.  Id. at 60.  The court noted that Stallings failed to put on any evidence of his possession or control of the bag, his historical use of the tote bag, or his ability or attempt to regulate access to it, or his efforts to preserve the tote bag and its contents as private.  Id. at 60-61.

In the recent case of United States v. Castleman, 795 F.3d 904 (8th Cir. 2015), the Eighth Circuit examined what constitutes open fields.  Based on prior suspected drug related activity, law enforcement obtained a search warrant for the defendant's residence.  Castleman, 795 F.3d at 908.  The defendant's residence was located on 262 acres of land.  Id.  The defendant's property was enclosed by a barbed wire fence and a locked gate.  Id.  While officers were searching the home, two investigators followed a driveway that led uphill to an area not visible from the house.  Id.  Over the crest of the hill, the investigators found closed garbage bags in a trailer.  Id.  Additionally, they observed a large plastic tarp near some hay bales.  Without moving the tarp, the officers were able to view a plastic gray tote underneath the tarp.  Id.  The officers moved the tarp, opened the tote and found materials used to manufacture methamphetamine.  The officers also opened the garbage bags and also found methamphetamine manufacturing materials.  Defendant moved to suppress the evidence found in the garbage bags and the plastic tote.

The <u>Castleman</u> defendant argued that the Eighth Circuit's decision in <u>Stallings</u> was not controlling, because unlike <u>Stallings</u>, Castleman owned the property and controlled access to it via fences and a locked gate.  The Eighth Circuit rejected defendant's argument noting that these privacy restrictions do not create a legitimate expectation of privacy in the field itself.  The Court stated, "property ownership and efforts to control access to the area are not enough to create an objectively reasonable expectation of privacy in open fields."  <u>Castleman</u>, 795 F.3d at 914 (citing <u>Oliver</u>, 466 U.S. at 179).  Concluding that given the nature of the open field which provided law enforcement and other people the ability to come across these items in the field, the Court noted, "Open fields are 'as a practical matter . . . accessible to the public and the police in ways that a home, an office, or commercial structure would not be' and '[i]t is not generally true that fences or 'No Trespassing' signs effectively bar the public from viewing open fields in rural areas."  <u>Id</u>.  It was also significant to the Court that Castleman did not take any steps to preserve the privacy of the trash bags and tote.  Without any evidence that Castleman possessed or controlled the bag, restricted or attempted to regulate access to it, the court held that there was no showing of an objectively reasonable expectation of privacy.  <u>Castleman</u>, 795 F.3d at 914.

With respect to Mr. Wellsandt's motion, the court must determine whether the black nylon bag was located in the curtilage of the home or in open fields.  In determining whether an area is within the curtilage of the home, the court is to consider four factors, "the proximity of the area claimed to be

curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.  United States v. Dunn, 480 U.S. 294, 301 (1987).   When applying the Dunn factors, they are not to be applied mechanically or in isolation.  United States v. Gerard, 362 F.3d 484, 488 (8th Cir. 2014).

   The facts presented in Mr. Wellsandt's case are largely undisputed.  Deputy Humphries and Deputy Nasser arrived at the Wellsandt residence to search a bench warrant on Jennifer Huggins.  Ms. Huggins was not at the residence and while returning to their patrol cars, officers found a black nylon bag on the ground somewhere between 10 and 20 feet from the residence.  While the exact distance is in dispute, the exact distance is non-determinative of whether the bag was within the curtilage of the home.  It is undisputed that it was located on the exterior of the railroad ties, which appear to create a border between a grassy area adjacent to the house and an area used for foot and vehicular travel.  In applying the Dunn factors, the black nylon bag was not located within any enclosure; there is no evidence that the defendant took any precautions to protect the black nylon bag to be seen by others; and the area was a commonly traversed area as evidenced by tire tracks immediately adjacent to where the black nylon bag was located. (Exhibit 10).  The black nylon bag appears to have been dropped or misplaced.  Although the bag was located as close as 10 feet from the house, distance alone is not determinative.  Christensen v. Quinn, 45 F.Supp.3d 1043 (D.S.D. 2014) (citing United States v.

Gerard, 362 F.3d 484, 487 (8th Cir. 2004)).  Although Deputy Nasser testified that he believed the bag was associated with the Wellsandt property, the manner in which the black nylon bag was lying demonstrates that this area was not what an "individual reasonably may expect that the area in question should be treated as the home itself."  Mathias, 721 F.3d at 956 (quoting Oliver, 466 U.S. at 180).  Here, any expectation of privacy that Mr. Wellsandt had was not objectively reasonable "because 'animals, children, scavengers, snoops and other members of the public' had access to the [nylon] bag."  Stallings, 28 F.3d at 61 (quoting United States v. Greenwood, 486 U.S. 35, 40 (1988)).  The court concludes that the black nylon bag was not within the curtilage of the home, but instead was located in open fields.

Mr. Wellsandt next argues that opening and searching the black nylon bag without a warrant was in violation of the Fourth Amendment because there was nothing immediately apparent about the bag to indicate illegal activity.  This exact argument was raised by the Castleman defendant and rejected by the Eighth Circuit.  Castleman, 795 F.3d at 914.  The Court noted that there is no expectation of privacy in a bag being left in an open field because the owner failed to show how he sought to preserve the tote bag as private.  In Wellsandt's case, like Stallings and Castleman, there has been no showing that Wellsdant controlled, used, or attempted to restrict access to the nylon bag.  Without such a showing, Wellsandt had no objectively reasonable expectation of privacy in the black nylon bag and as such there is no Fourth Amendment violation.

Because the court concludes that there is no Fourth Amendment violation, the court rejects defendant's argument that the search warrant for the house in invalid because it contained information regarding the contents of the black nylon bag.

Although not raised in his initial motion and brief, Mr. Wellsandt argues in his post-hearing brief, that the affidavit in support of the first search warrant contained incorrect information regarding Mr. Wellsandt's criminal history. At paragraph 21 of the affidavit, it states, "During the years of 1995 through 2010 Wellsandt has numerous convictions for both distribution and possession of methamphetamine/controlled substances." Ex. 1, p.3 at ¶21. Mr. Wellsandt questioned Deputy Nasser during cross examination and showed him a document purporting to be Mr. Wellsandt's criminal history. The criminal history document was not introduced into evidence. Deputy Nasser insisted that that his affidavit was not inaccurate as written. Although this issue wasn't raised and the court did not have an opportunity to determine whether the defendant has met the required showing for a Franks hearing, the court will address whether this information invalidates the search warrant.

A defendant may only challenge the veracity of the affiant's statements and not that of nongovernmental informants because a reviewing court is concerned only with whether the affiant knowingly and deliberately included falsehoods or recklessly omitted the truth. Id. See also United States v. Ball, No. 06-4135, * 5 (8th Cir. Aug. 22, 2007); United States v. Amburn, 412 F.3d

909, 917 (8th Cir. 2005) (both citing Franks v. Delaware, 438 U.S. 154, 171 (1978)).

"To show reckless disregard for the truth, we do not look simply at whether a statement included in the affidavit was true; rather, we ask whether, when looking at all the evidence available to the officer, the officer 'must have entertained serious doubts as to the truth of his [or her] statements or had obvious reasons to doubt the accuracy of the information he [or she] reported.' " United States v. Neal, No. 07-1941, at *4 (8th Cir. June 16, 2008) (quoting United States v. Schmitz, 181 F.3d 981, 986-987 (8th Cir. 1999) (quoting United States v. Clapp, 46 F.3d 795, 801 n.6 (8th Cir. 1995)) (alterations in original). Under this standard, "every fact recited in the warrant affidavit [need not] necessarily [be] correct." United States v. Buchanan, slip op. 08-3515 (8th Cir. July 27, 2009) (quoting Franks, 438 U.S. at 165). Here, there is no evidence that Deputy Nasser knowingly and deliberately included falsehoods, entertained serious doubts as to the truth of his statement or had obvious reasons to doubt the accuracy of the information he reported. The court rejects Mr. Wellsandt's argument that the first search warrant was invalid due to Deputy Nasser's statement regarding Mr. Wellsandt' criminal history.

Lastly, Mr. Wellsandt argues that his 1969 pickup truck was illegally seized because it was not identified in the first search warrant as an item to be searched. The relevant facts of this case are as follows: while law enforcement were executing the search warrant for the residence, Mr. Wellsandt drove up in his 1969 pickup truck; he was placed under arrest; his vehicle was towed to

the Meade County secured evidence lot; a warrant for the search of his vehicle was obtained and executed. Mr. Wellsandt cites no authority, and the court is not aware of any, that towing and securing a vehicle post arrest is a Fourth Amendment violation. The search of the vehicle was conducted pursuant to a warrant. Mr. Wellsandt's only argument against the validity of the search warrant is rooted in his belief that the search of the nylon bag was illegal and inadmissible. Given the court's rejection of this argument, there is no remaining argument that the second search warrant and subsequent search of his vehicle was invalid and inadmissible.

## CONCLUSION

It is respectfully recommended that Mr. Wellsandt's motion to suppress be denied in its entirety.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665 (8th Cir. 1986).

DATED this 29th day of September, 2015.

BY THE COURT:

DANETA WOLLMANN
United States Magistrate Judge